**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **FAZZINO INVESTMENTS, LP,** | § | |
| **for itself and all others similarly** | § | |
| **situated,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CASE NO. 6:25-cv-00001-ADA-DTG** |
| | § | |
| **BRAZOS VALLEY GROUNDWATER** | § | |
| **CONSERVATION DISTRICT,** | § | |
| | § | |
| *Defendant.* | § | |

## <u>DEFENDANT BRAZOS VALLEY GROUNDWATER CONSERVATION DISTRICT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Brazos Valley Groundwater Conservation District (the "District") submits this Motion for Summary Judgment. In support thereof, the District respectfully states the following:

### EXECUTIVE SUMMARY

Plaintiff's takings claim cannot be established—and actually is refuted and precluded—by the undisputed evidence in this case. Plaintiff has suffered neither a regulatory taking nor a physical invasion, and its claim must be dismissed.[1]

---

[1] Defendant's Rule 12(c) Motion for Judgment on the Pleadings and/or Rule 56 Motion for Summary Judgment (Dkt. 50), is fully incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c). That Motion fully explains why Plaintiff's takings claim—including the allegations of illegality Plaintiff continues to maintain—warrants dismissal on threshold grounds alone, without reaching the substantive bases raised herein. Additionally, Defendant's Response to Plaintiff's Motion for Summary Judgment (Dkt. 76), incorporated by reference herein, further supports denial of that motion and dismissal of the claim.

Plaintiff pleads that the District's amendments of its rules caused it to suffer both a per se and regulatory taking.  (Dkt. 1 at 11–13, Dkt. 31 at 9.)  That claim, however, is an abstract hypothetical, whereas legitimate takings claims must stand or fall based on actual evidence of an actionable and redressable injury to plaintiff.

As to that necessary evidence, this Court correctly observes that to prove a regulatory taking "requires balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."  (Dkt. 63 at 8.)

The Court further correctly observes that, in the circumstances of Plaintiff's pleaded claim about the purported effect of the Amended Rules, "[t]o determine whether [Plaintiff has] experienced a per se taking, the Court would need evidence of drainage. The Court cannot simply infer that drainage is happening."  (*Id.*)

There is no evidence to support any of those factors, and Plaintiff actually disclaims any evidence that would support them.  With respect to a regulatory taking:

- Both Plaintiff and Plaintiff's expert disclaim any knowledge or opinion of the value of Plaintiff's tract as a whole (or even just the groundwater portion) before and after the rules were amended;

- Plaintiff had no reasonable investment-backed expectations in producing Simsboro groundwater at a rate greater than 1,100 acre-feet per year, as its tract was acquired by gift and Plaintiff has made neither any material effort nor any investment in developing its groundwater; and

- The Amended Rules neither authorize physical entry, appropriate any easement, nor dispossess Plaintiff of any discrete asset—and the evidence shows they have no such effect on Plaintiff's tract in any event.  Rather, generous production of Simsboro groundwater is still allowed.

With respect to a per se taking, the evidence precluding any finding of the requisite injury of "drainage" is just as stark:

- Both Plaintiff and Plaintiff's expert disclaim any knowledge or opinion that there is *any* drainage taking place beneath Plaintiff's tract;

- Both Plaintiff and Plaintiff's expert disclaim any knowledge or opinion of any neighboring well that *could* be draining the groundwater beneath Plaintiff's tract;

- Plaintiff's expert concedes that there is no depletion of the groundwater from beneath Plaintiff's tract;

- Plaintiff's expert concedes that—regardless of proximity to Plaintiff's tract—no large-volume well is depleting the Simsboro groundwater anywhere else in the District; and

- Plaintiff's expert further concedes there is no evidence of "artesian head" reduction on Plaintiff's tract.

Unable to prevail on any recognized takings theory, Plaintiff brings this as a "test case" invoking the *Marrs v. Railroad Commission* oil and gas approach to "correlative rights" and confiscation by drainage/depletion to apply to groundwater. The Court should reject this unprecedented application. Even if the Court imprudently indulged in that approach, Plaintiff's claim would still fail: the *Marrs* approach requires injury from actual drainage without offset opportunity. Plaintiff concedes no drainage or depletion exists and does not even provide evidence of non-actionable artesian head reduction. This concession precludes the requisite injury finding even under *Marrs*.

Plaintiff admits nothing has happened to Plaintiff's Simsboro groundwater. Plaintiff did not and cannot establish a regulatory taking of its property under *Penn Central*, a per se taking under *Cedar Point*, or even a taking under its novel and extra-legal *Marrs v. Railroad Commission* "correlative rights" drainage/depletion theory.

3

## STATEMENT OF FACTS

**A.    Plaintiff's Property:**

Plaintiff's property that is the subject of the Complaint is a 69.41-acre tract of land in Robertson County ("Fazzino Property" or "Plaintiff's tract").  (Ex. B at 18:3–10.) It was acquired by Plaintiff as a gift transfer in 2021 (Ex. B at 18:11–20:6) and has been used for hay production both before and after Plaintiff's acquisition (Ex. B at13:10–25), earning around $10–15 per acre for the hay production lease rights (Ex. B at 14:19–15:7.)

There is no Simsboro aquifer well on the Fazzino Property, and Plaintiff has never sought a permit for such a well, either before or after the District's 2023 rule amendments.  (Ex. B at 105:18–25.)

**B.    The District's Rules:**

The District was created to conserve, preserve, protect, and recharge groundwater in Brazos and Robertson Counties, with broad authority under Chapter 36 of the Texas Water Code to manage groundwater resources within its jurisdiction.  Pursuant to that authority, the District promulgates rules, including rules governing well spacing and production limits.

Under the District's current rules, Plaintiff could obtain a permit to produce 587.1 acre-feet of Simsboro groundwater per year, which amounts to 8.46 acre-feet per surface acre owned by Plaintiff.  (Ex. A, Ex. A-1.)  Once such a permit is obtained, the District's rules allow for that permit and the groundwater production thereunder to be

maintained indefinitely. (Ex. A-3[2]; Ex. B at 38:18–25.) That permitted amount is among the most generous among Groundwater Conservation Districts in the state. (Ex. A-2.)

## C.   Property Valuation:

Both Plaintiff and Plaintiff's expert, Mike Thornhill, concede that they have no evidence nor do they offer any opinion of the value of Plaintiff's tract as a whole. They even decline to offer any evidence or opinion of the value of the Simsboro groundwater component of the estate—before or after the District's 2023 rule amendments. (Ex. B at 32:13–33:12, 36:20–38:9.) Plaintiff concedes that no appraisals of the property have been conducted, either before or after the amendments to the District's Rules. (Ex. B at 36:20–37:9.) Plaintiff concedes that it has no information about the value of any groundwater on any of its property. (Ex. B at 55:25–56:3.) Further, Plaintiff has no knowledge of the value of any part or whole of the estate/tract. (Ex. B at 96:16–97:10; Ex. C at 14:10–14.) The only available evidence of value of the tract is county property tax records, which show that the value of the tract has *increased* since the Amended Rules were promulgated in 2023. (Ex. B at 33:16–36:3.)

## D.   Development of groundwater well on Plaintiff's Property:

Plaintiff has never made an effort to market or sell groundwater before or since the rule amendments. (Ex. B at 62:22–63:19; 71:12–23.) Plaintiff had no contract or commitment in place to sell water before the rule change. (Ex. B at 86:8–16.) Plaintiff has not expended any material time or money in pursuing the development of Simsboro

---

[2]   The copy of the Rules attached to Mr. Day's declaration is the most current iteration of the Rules. The relevant text of the Rules challenged in this action, specifically Rules 6.1 and 7.1, is unchanged from the version of the Rules promulgated September 2023.

aquifer groundwater beneath its property. (Ex. B at 91:16–92:4, 98:7–13.) Plaintiff did not analyze the possible cost of a Simsboro well on its tract, either before or after the rule amendments. (Ex. B at 89:13–91:13.) Plaintiff did, however, discuss various possible uses for the tract's Simsboro groundwater under the current Rules with the District's General Manager, Alan Day, including potential commercial use with Wellborn SUD as well as potential residential use. (Ex. B at 24:6–27:17, 29:14–30:15, 92:5–18.) Under the existing rules, there are multiple potential uses of the tract's groundwater and the surface estate has additional uses, as well. (Ex. B at 92:15–93:5.)

Thornhill acknowledges (1) that there can be multiple other uses for Simsboro water in the District, and (2) he hasn't analyzed any tract (including the Fazzino tract) to determine what purposes might be applicable, or the economic cost or yield of such purposes. (Ex. C at 18:17–20:13, 21:14–22:3.)

**E.    No drainage or depletion of groundwater from Plaintiff's Tract:**

There is no evidence of any actual drainage of groundwater from beneath the Fazzino tract, or any evidence that the volume of groundwater in place has been reduced by any measurable amount. Plaintiff concedes that it has no evidence of drainage, and deferred to its expert to support that allegation. (Ex. B at 85:12–15, 86:21-89:1, 98:17–99:13.) But instead of supporting the allegation, Plaintiff's expert concedes that he does not have any opinion that any groundwater actually has been "drained" from beneath the Fazzino tract (or any other tract).

> Q   And again, "drainage," your -- that's your change in direction and magnitude of flow through the aquifer?
> A   Yes.
> Q   Okay.  You're not offering any opinion that that effect has actually occurred or is about to occur on the Fazzino tract?
> A   I don't have any basis to -- to know if it is or isn't on the Fazzino tract.  No.

> Q   Okay.  And again, you're not offering any particular opinion as to any landowner suffering drainage as you define it; right?
> A   That's correct.
> Q   You're not offering any opinion as to any landowner suffering reduction in storage of any amount; right?
> A   That's correct.

(Ex. C at 59:19–60:2, 77:10–17.)

He does not even offer any opinion that the "artesian head" of any potential well on the Fazzino tract has declined (a transitory effect that does not reduce the amount of groundwater in storage) as a result of the operation of any other wells. (Ex. C at 37:23–38:7.)  He does not offer any opinion that the amount of Simsboro groundwater beneath the Fazzino tract has been reduced by any measurable amount. (Ex. C at 38:8–12.)  Instead, he concedes that the operation of large-volume wells within the District will still leave the aquifer "completely full, and there will be only an infinitesimal reduction in storage."  (Ex. C at 42:20–43:8.)  In short, the facts disclosed by Plaintiff and Plaintiff's expert reveal that functionally *nothing* has

7

happened or will happen to the Simsboro groundwater beneath Plaintiff's tract as a result of the District's rule amendments.

## SUMMARY JUDGMENT EVIDENCE

In support of the District's Motion for Summary Judgment, the District relies upon and incorporates by reference the following:

Exhibit A    Declaration of A. Day

    Attachment A-1    Well Footprint Diagram
    Attachment A-2    Groundwater Production Chart
    Attachment A-3    District's Rules

Exhibit B    Plaintiff's Corporate Representative Deposition Excerpts

Exhibit C    M. Thornhill Deposition Excerpts

Exhibit D    Order, *Fazzino v. Roe, et al.*, No. 6:18-CV-00114-JCM (Aug. 23, 2021)

## STANDARD OF REVIEW

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Court need not determine that there is no factual dispute, only that there are no material facts in dispute. A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Smith v. Harris Cnty.*, 956 F.3d 311, 316 (5th Cir. 2020). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 255. The party moving for summary judgment bears the initial burden of "informing the

8

district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant may discharge its summary judgment burden by pointing out to the court that there is an absence of evidence to support the non-movant's case. *Id*. at 325. Once the movant has done so, the non-movant must set forth facts to show that there is a genuine issue remaining for trial. *Jackson v. Widnall*, 99 F.3d 710, 713 (5th Cir. 1996).

## ARGUMENTS AND AUTHORITIES

**A.    Plaintiff's takings claim must be dismissed because each of Plaintiff's takings theories fail as a matter of law.[3]**

Plaintiff has pleaded both a regulatory taking and a per se/physical invasion taking. (Dkt. 1 at 11–13.) Even if the Court considers the merits of those theories and sets asides the intellectual and legal incongruity created by Plaintiff's pleading of illegality, both of Plaintiff's taking theories fail on their own terms, doomed by Plaintiff's own evidence that negates all necessary factors.

### 1.    *Applicable Takings Law*

#### a.    *Regulatory Takings:*

The Fifth Amendment prohibits the government from taking private property without just compensation. Not every regulation that affects or limits property use constitutes a compensable taking. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Where no permanent physical occupation is alleged, courts apply the

---

[3]    Defendant further incorporates by reference its arguments regarding the merits of Plaintiff's takings claim in its Response in Opposition to Plaintiff's Motion for Class Certification (Dkt. 39.)

multi-factor balancing test established in *Penn Central*. Under that framework, courts weigh three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Id.* This Court already understands those factors as they apply to Plaintiff's claim in this case. (Dkt. 63 at 8.)

The first factor requires more than a showing of diminished value—the claimant must demonstrate a substantial diminution in the value of the *parcel as a whole*, not merely of the affected use or segment of the property. *Penn Cent.*, 438 U.S at 130–31. Courts refuse to "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Id.* at 130. That is, even if Plaintiff had evidence that its property interest in the Simsboro groundwater beneath its land had been entirely abrogated such as to have no value, the Court would still have to examine the value of the Plaintiff's tract as a whole.

The second factor turns on whether the claimant held reasonable, investment-backed expectations that the regulatory regime would not apply. Expectations that were never reasonable—because the resource, the property interest in which is defined by state law, has long been subject to pervasive state regulatory authority—do not weigh in favor of a taking. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984). They certainly carry little weight when there was neither any investment nor any expectations.

The third factor examines whether the governmental action more closely resembles a physical invasion versus an "adjustment of the benefits and burdens of

economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. A general regulatory limitation on the use of a shared and regulated resource—particularly one that still allows one of the most generous annual production amounts in the state—falls squarely toward the latter end of that spectrum.

### b.    *Per Se/Physical Invasion:*

A categorically different—and categorically narrow—theory applies when the government physically appropriates property or authorizes a third party's permanent physical occupation of it. *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). In *Cedar Point*, the Supreme Court held that a regulation requiring agricultural employers to allow union organizers onto their land effected a *per se* taking because it appropriated an easement—a government-authorized right of physical invasion—in favor of a third party. *Id.* at 148.

The Court carefully confined its holding. A physical invasion taking requires an actual government-authorized physical appropriation of property or a compelled grant of access to a third party. *Id.* at 152–53. The *per se* rule does not reach regulations that merely restrict a property owner's use of their own property—those remain governed by *Penn Central. Id.* at 153. The Court reaffirmed that regulatory adjustments to the use of a natural resource held subject to state authority are analyzed under *Penn Central*, not as categorical physical takings. *Id.* Additionally, the nature of the property interest that is purportedly being "physically invaded" matters. Plaintiff's property interest in Simsboro groundwater is a property interest created under Texas state law. *See Ruckelshaus,* 467 U.S. at 1001 (Property interests "are created and their dimensions

11

are defined by existing rules or understandings that stem from an independent source such as state law") (cleaned up). And that groundwater property interest—as it intersects with the "right to exclude" that Plaintiff attempts to invoke—is limited: "a landowner has a right to exclude others from groundwater beneath his property, *but one that cannot be used to prevent ordinary drainage.*" *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 830 (Tex. 2012). That is, even if Plaintiff's theory were applicable, Plaintiff would have to show more than mere drainage of some Simsboro groundwater from beneath its tract as a result of the amended rules; it would have to show that something *greater* than "ordinary drainage" is happening.

### 2.   *Penn Central, not a categorical rule, governs this claim.*

While Plaintiff has pivoted to arguing physical invasion, the claim pleaded and before this Court is a regulatory taking and the *Penn Central* factors are dispositive. Yet, based on the evidence provided, and particularly the evidence *not* provided, Plaintiff seemingly disclaims a taking based on the *Penn Central* factors.

### 3.   The evidence negates each *Penn Central* factor.

Plaintiff argues its challenge is "facial" because the rules "cause an unconstitutional result without exception." (Dkt. 66 at 19.) That theory cannot be squared with *Penn Central*, which was specifically crafted to reject categorical rules in favor of property-specific, context-sensitive analysis. 438 U.S. at 124. A facial regulatory taking claim is cognizable only in the narrow circumstance where the regulation categorically eliminates all economically productive use of land. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Plaintiff does not allege a total wipe-out of all

12

economically productive land use; it alleges a reduction in groundwater production capacity.[4] That is a *Penn Central* partial-regulatory-taking claim, which is inherently property-specific and cannot be adjudicated on a facial, across-the-board basis.

Importantly, as to those property-specific factors, Plaintiff has disclaimed any of the requisite proof. When asked to provide it, Plaintiff presented no evidence of any economic impact in the form of quantified lost value of its tract as a whole (or even to the Simsboro groundwater estate in isolation). Plaintiff admittedly has neither any investment in its property (either as a whole or as just a groundwater asset) nor any investment-backed expectations in its property. The absence of such evidence must be deduced to mean that no such lost value occurred and that there were no reasonable investment-backed expectations, thus requiring dismissal of Plaintiff's claim.

### a.    *No economic impact on the parcel as a whole:*

*Penn Central* requires assessment of the economic impact on Plaintiff's 69.41-acre parcel as a whole, not merely on the groundwater rights Plaintiff might aspire to develop. 438 U.S. at 130–31. Courts refuse to "divide a single parcel into discrete segments." *Id.* at 130. Rather, the test for a regulatory taking requires the court "to compare the value that has been taken from the property with the value that remains in the property . . ." *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017). When asked to provide such valuation facts

---

[4]    Plaintiff argues that an "economically feasible groundwater well" must be a well that produces over 1,100 acre-feet per year, seemingly attempting to make a *Lucas* argument without citing to *Lucas*. Of course, Plaintiff must avoid *Lucas* because (1) the tract as a whole has undisputed existing economic value and use, and (2) even if the groundwater estate was the *only* property interest, that too has potential economic use (residential use, sale to a local utility district, etc.).

and opinions, neither Plaintiff nor Plaintiff's expert even *have* any evidence of the value of the entire parcel or even the value of the groundwater portion of the estate in isolation; Plaintiff addresses only the general economics of commercial groundwater production. No evidence has been provided, and none exists, of any diminution in value of the 69.41-acre tract considered as a whole—for any use, agricultural, commercial, or otherwise. That failure is fatal to the first *Penn Central* factor.

Plaintiff's complaint that drilling is economically infeasible is conclusory and unsupported by evidence of actual cost-benefit analysis, market value of water rights under the Amended Rules, or alternative uses (which Plaintiff concedes exist). The economic impact of a regulation is a primary factor that requires careful examination and weighing of all relevant circumstances. Plaintiff conceded that it has no evidence regarding the actual market value of its property before and after the Amended Rules, the cost of drilling and operating a well under the New Rules (Ex. B 89:15–91:13), the market price/value for water under Plaintiff's tract that could be produced under the New Rules, or whether alternative uses of the property remain economically viable.

Neither Plaintiff nor Plaintiff's expert offer *any* evidence or opinion of the value of the tract as a whole—or even just the value of the Simsboro groundwater component of the estate—before or after the District's 2023 rule amendments. (Ex. B at 32:13–33:12, 36:20–38:9 (no appraisals), 38:6–9 (no groundwater value), 55:25–56:3, (no knowledge of value of any part or whole of estate), 96:16–97:10; Ex. C at 14:10–14.) In fact, Plaintiff's expert expressly disclaimed offering any opinion of monetary value.

14

> Q   Okay.  So you're not offering any opinion of the dollar value of the Fazzino tract in this case?
> A   No.
> Q   Either before the rule change or after?
> A   No.
> Q   You're not offering an opinion as to the dollar value of the groundwater component of the Fazzino tract alone?
> A   Nope.

(Ex. C at 15:8–16.)

In addition to not offering any opinion, Thornhill has no knowledge of valuation of any tract of groundwater in the District.  (Ex. C at 63:14–24.)  Plaintiff has no appraisal or other evidence to establish valuation and satisfy this requisite element of its takings claim.  Instead, the county tax records (the only existing valuation evidence) show that the value of the tract as a whole has *increased* since the Amended Rules were promulgated in 2023.  (Ex. B at 33:16–36:3.)

The complete absence of such evidence, particularly when all such potential facts were the subject of diligent inquiry by Defendant, is dispositive of the economic impact factor.

### b.    *No investment-backed expectations:*

Plaintiff acquired the 69.41-acre tract in 2021 as a gift without a groundwater production permit and without a well.  (Ex. B at 18:3–20:6.)  It has never invested in groundwater production infrastructure on the property.  (Ex. B at 91:16–92:4, 98:7–13.) Its stated goal is only to *sell* its groundwater rights to a commercial production company. (Dkt. 66 at 3.)  And while Plaintiff testified about the abstract potential for selling water to a system like Wellborn Utility District, it testified that it never had any conversation

with Wellborn for such plans.  (Ex. B at 24:14–16.)  There are no contracts in place to sell water.  (Ex. B at 103:21–105:15.)  Plaintiff has made *no* investment and incurred *no* expenses in any effort to sell or market its groundwater either before or after the rule amendments.   (Ex. B at 62:22–63:20, 71:12–23.)   A mere prospective commercial aspiration held by a landowner that has never produced from the property is not a "distinct investment-backed expectation" entitled to *Penn Central* protection.  Moreover, the District has held and exercised state-granted authority to set and revise production limits since its formation in 2001.  No landowner could hold a reasonable expectation of production rights forever unconstrained by future rule changes.

The reasonable investment-backed expectation analysis is designed to account for property owners' expectation that the regulatory regime in existence at the time of the acquisition will remain in place.  *See Rith Energy v. United States*, 270 F.3d 1347, 1350–51 (Fed. Cir. 2001).  The purpose of considering "investment-backed expectations is to limit recoveries to property owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Columbia Venture, LLC v. Richland Cnty.*, 413 S.C. 423, 449 (2015) (quoting *Cienega Gardens v. United States*, 331 F.3d 1319, 1345–46 (Fed. Cir. 2003)).  The critical question is what a reasonable owner in the claimant's position should have anticipated.  *Id.* (quoting *Chancellor Manor v. United States*, 331 F.3d 891, 906 (Fed. Cir. 2003)).

Here, where Plaintiff made no investment in property it acquired by gift, and even then, acquired the property knowing that groundwater regulation was subject to change and/or that in a regulated field, any investment-backed expectations it had would be

16

correspondingly limited.  A property owner cannot reasonably rely on an assumption that regulations will forever remain the same, and that the government will refrain indefinitely from valid changes in zoning/regulation to enhance the public interest.  *See Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 161 (1980) ("a mere unilateral expectation or an abstract need is not a property interest entitled to protection.")  Groundwater regulation in Texas is authorized and contemplated by state law. Groundwater provides 60% of the water used in Texas each year, and in many areas of the state, demand exceeds supply.  *Day*, 369 S.W.3d at 840.  Given this regulatory context, a reasonable property owner should have anticipated potential periodic changes to groundwater production rules for future permits.  The evidence proving that Plaintiff had no investment-backed expectations definitively negates that *Penn Central* factor and requires dismissal of Plaintiff's claim.

### c.       *Character of the governmental action negates a taking:*

The Amended Rules adjust the acreage-to-production ratio for new permit applications in furtherance of aquifer conservation. That is a textbook "adjustment of the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.  The Amended Rules do not authorize physical entry onto Plaintiff's land, appropriate an easement, or dispossess Plaintiff of any discrete asset.  Rather, generous production of groundwater is still allowed; Plaintiff could obtain a permit for 587.1 acre-feet of Simsboro groundwater per year, equating to 8.46 acre-feet of water per surface acre of the tract.  (Ex. A, Ex. A-1.)  That annual permitted amount is among the

17

most generous in the State of Texas.  (Ex. A-2.)[5]  This factor weighs heavily against a taking, and thus further merits dismissal of Plaintiff's claim.

### 4.      The *Cedar Point* physical invasion theory fails.

Plaintiff's physical invasion theory fails at the threshold.  *Cedar Point* requires identification of a specific government-authorized physical occupation of or intrusion upon the claimant's property.  *Cedar Point*, 594 U.S. at 152–53.  A rule adjusting the permissible volume of groundwater production by permittees within the District does not authorize any person to physically enter Plaintiff's 69.41-acre tract, does not appropriate any easement across it, and does not compel Plaintiff to grant any sort of access to any third party, particularly in the absence of any adjacent large-volume well. As this Court correctly noted, "[t]o determine whether the [Plaintiff has] experienced a per se taking, the Court would need evidence of drainage."  (Dkt. 63 at 8.)[6]

---

[5]   This comparison only matters if Plaintiff's broad "fairness" argument merits any consideration—which it does not.  Plaintiff states its "fairness" argument as a question of "whether BVGCD may simultaneously apply two disparate sets of Rules . . ."  (Dkt. 77, p. 1).  That isn't a takings argument, as no takings law has a comparative element.  Instead, it is (or would be) a doomed "equal protection" argument in a case where no equal protection claim is pleaded.  Plaintiff did not plead equal protection for good reason: that argument and claim was already considered and rejected by this Court where a plaintiff alleged that the District's rules, by grandfathering the City of Bryan's Well 18 as an "existing well" while denying him equivalent production rights, violated his right to equal protection.  *See* Order at 5, *Fazzino v. Roe, et al.*, No. 6:18-CV-00114-JCM (Aug. 23, 2021) (finding that a similar "temporal break" between comparators defeated an allegation of unequal treatment). (Order attached as Ex. D.)  For further discussion, see Defendant's Response to Plaintiff's Motion for Summary Judgment (Dkt. 76), incorporated herein.

[6]   Plaintiff couches its claim as something of a "right to exclude" claim, arguing that it must be allowed to prevent others from draining the Simsboro groundwater from beneath its land, but does so without acknowledging what its actual property right is: "a landowner has a right to exclude others from groundwater beneath his property, *but one that cannot be used to prevent ordinary drainage*."  *Day*,

Plaintiff has no such evidence because Plaintiff has not had *anything* confiscated or taken from it.  When asked, Plaintiff did not present evidence of any "drainage" beneath its property, and Plaintiff concedes that it has no evidence of any such drainage. (Ex. B at 84:20–85:4, 85:12–15.)  Plaintiff deferred to its expert for any opinion on drainage.  (Ex. B at 88:7–11, 88:21–89:1.)  But Plaintiff's concession was corroborated by its expert, who expressed no opinion of any drainage occurring on Fazzino's, or any other, tract.  (Ex. C at 59:19–60:6, 77:10–13.)  Plaintiff had no evidence of any depletion or reduction in storage of Simsboro aquifer groundwater beneath its property in any amount, and Plaintiff's expert actually concedes no such reduction has taken place or ever will take place.  (Ex. C at 38:8–12, 42:20–43:8, 77:14–17.)  Plaintiff further concedes that there is not even any evidence of decline in artesian head or pressure (which transient decline in artesian pressure up a non-existent well bore still would not constitute "drainage") beneath Plaintiff's tract.  (Ex. C at 37:23–38:7.)

To find a per se taking, "the Court would need evidence of drainage."  But no drainage or depletion of the Simsboro groundwater beneath Plaintiff's tract is happening.  When Plaintiff and Plaintiff's expert were asked what evidence of drainage they have, their answers were essentially "none."  There thus is no physical invasion and no *Cedar Point* claim.  The effect of the regulatory adjustment of the District's Rule Amendments, if it is to be considered at all, must be examined under *Penn Central* alone—under which, as shown above, Plaintiff cannot prevail.

---

369 S.W.3d  at 830 (emphasis added).  Thus, Plaintiff would need not just evidence of drainage, but of drainage greater than "ordinary drainage."

The evidence cited herein negates all essential elements of Plaintiff's takings claim, and combined with Plaintiff's admitted lack of evidence as to those elements, means that Plaintiff cannot meet its burden of proving all elements of its takings claim. There is no taking of Plaintiff's property.  Summary judgment should be granted.

**B.      Plaintiff's oil & gas takings theory is based on the wrong doctrine, and the wrong (and missing) facts.**

Plaintiff cannot prevail on a *Penn Central* or *Cedar Point Nursery*-type claim. So, Plaintiff instead asks this Court to do something that no Texas court has ever done: adopt and apply to *groundwater* the oil and gas confiscation/drainage rule from *Marrs v. Railroad Commission*, 177 S.W.2d 941 (Tex. 1944).  No Texas court has ever applied the *Marrs* approach to groundwater, and as the property right at issue is a creature of state law, this Federal court should not be the first to do so.  But if the Court is inclined to even examine the approach, it is plain the *Marrs* approach has not been adopted for very good reason—"[g]roundwater is different" than oil and gas in many relevant respects.  Finally, any academic discussion of what Texas law is or should be is beside the point: even if the *Marrs* approach was adopted, Plaintiff could not establish a taking because the occurrence of drainage is a necessary element of that approach, and Plaintiff's witnesses have made clear there is no drainage of Simsboro groundwater from beneath Plaintiff's tract.

> ### 1.      The <u>Marrs</u> concept only flows so far, as groundwater is fundamentally different from oil and gas.

The *Marrs* oil and gas approach to "correlative rights" and drainage has existed for over eighty years.  The Texas Supreme Court had the opportunity to consider and

apply that approach in total to groundwater in *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, but declined to do so.

The *Day* Court actually explained its reasoning, first acknowledging the oil and gas principle embedded in *Marrs* and advanced by Plaintiff here, that "[t]he principal concerns in regulating oil and gas production are to prevent waste and to provide a landowner a fair opportunity to extract and market the oil and gas beneath the surface of the property." *Id.* at 831. The *Day* court then immediately distinguished "[g]roundwater is different in both its source and uses." *Id.* The court went on both to acknowledge the "fair share" interest under oil and gas law (citing *Elliff v. Texon Drilling Co.*, 201 S.W.2d 558, 562 (Tex. 1949)) but also to note key differences:

> Because a reservoir's supply of oil or gas cannot generally be replenished, and because oil and gas production is most commonly used solely as a commodity for sale, land surface area is an important metric in determining an owner's fair share. . . *Groundwater is different.* Aquifers are often recharged by rainfall, drainage, or other surface water. The amount of groundwater beneath the surface may increase as well as decrease; any volume associated with the surface is constantly changing.

*Id.* at 840–41 (emphasis added). Perhaps most importantly for this case, the *Day* court held that that while a landowner can prohibit slant wells targeting formations under his property, this right "cannot be used to prevent ordinary drainage." *Id.* at 830. The Court concluded that groundwater and oil and gas rights "are different," with "important differences between groundwater and hydrocarbons." *Id.* at 831.[7]

---

[7]    In its dispositive motion practice, Plaintiff also points to dicta in *Coyote Lake Ranch v. City of Lubbock*, 498 S.W.3d 53 (Tex. 2016) to argue that oil and gas law is applicable to groundwater production *in toto* (*see* Dkt. 77 at 6). Those citations ignore

The *Marrs* approach requires a "fair chance" to recover hydrocarbons from a common reservoir because the reservoir of that non-renewable resource is being drained and depleted by adjoining drilling. *Marrs*, 177 S.W.2d at 948 (oil was "taken from the depleted Church-Fields area [and] replaced by oil drained from petitioners' property.") Drainage of non-renewable hydrocarbons is the necessary predicate. Groundwater is subject to and not protected from "ordinary drainage," and "is often being replenished from the surface." *Day*, 369 S.W.3d at 830, 831. Of course, in this case the groundwater beneath Plaintiff's tract is not being drained or depleted at all.

Not only does the law speak to the difference in character between oil and gas and groundwater, so does Plaintiff's expert regarding this very aquifer:

> Q   That's correct. So it is correct if we were standing in front of the court today, and the judge turned to you and asked, "Look, I want to know what these large-volume wells do to the total volume of water remaining in storage under any particular property." You would say, "The aquifer will remain completely full, and there will be only an infinitesimal reduction in storage." Wouldn't you?
>
> A   Yes.
>
> Q   Bottom line is, however many millions of gallons of Simsboro groundwater exists in a local area, that number of millions are going to remain functionally the same.
>
> A   Functionally the same in -- yes.

(Ex. C at 42:20–43:8.)

---

(1) that the actual *holding* in *Coyote Lakes* was limited to extending the "accommodation doctrine" of oil and gas law to groundwater, and (2) the dicta observation of the commonalities between oil and gas law and groundwater law immediately followed the recognition of an "important difference" in that water is often renewable, whereas hydrocarbons are not. *Id.* at 63–64. No Texas case has ever held that oil and gas law applies to groundwater *in toto*. Each case instead examines whether the analogy fits the specific doctrine at issue.

22

The *Day* court knew about *Marrs* and the principles contained therein. It acknowledged the key principle, followed immediately by discussion of how hydrocarbons and groundwater are different. And most importantly, neither *Day* nor any other Texas case before or since has ever adopted or applied the *Marrs* approach regarding drainage in the groundwater context. This Court should not do what Texas courts—having had ample opportunity to do so—have thus far declined to do.

> **2.      Even if the <u>Marrs</u> approach applied, there is no actionable injury because there is no "drainage" or "confiscation," which are necessary elements.**

The foundational premise/element of the *Marrs* analysis and "rule" was that there must be depletion of a common reservoir. With no depletion, there cannot be any deprivation of a "fair chance to produce a fair share." While sometimes inexplicably stating that "drainage" is a "red herring distraction," Plaintiff acknowledges that necessary predicate in its own Motion for Summary Judgment, tying its "fair share" argument to the point that denial of "the *right* to protect their property from drainage is a 'confiscation' (taking)" and the purpose of the principle is "to prevent confiscation of [the landowner's] property" (quoting *R.R. Comm'n v. Shell Oil*, 380 S.W.2d 556 (Tex. 1964)).[8] "Drainage" and "confiscation" are the central and essential principles.

---

[8]    Plaintiff repeatedly cites to numerous oil and gas cases from which it plucks the words "fair chance" and "fair share." *See, e.g., Gulf Land Co. v. Atlantic Refin. Co.*, 131 S.W.2d 73 (Tex. 1939); *Marrs*, 177 S.W.2d 941 (Tex. 1944); *Elliff*, 201 S.W.2d 558 (Tex. 1949); *R.R. Comm'n v. De Bardeleben*, 305 S.W.2d 141 (Tex. 1957); *Halbouty v. R.R. Comm'n*, 357 S.W.2d 364 (Tex. 1962); *Texaco Prod. Inc. v. Fortson Oil Co.*, 798 S.W.2d 622 (Tex. App.—Austin 1990, no writ). But Plaintiff omits the critical context: a "fair chance" means the opportunity to prevent confiscation through drainage. *See Gulf Land Co.*, 131 S.W.2d at 80 ("As used in Rule 37 and the Rule of May 29th, the term 'confiscation' evidently has reference to depriving the owner or lessee of a

So, how does one establish the "injury" that Plaintiff complains of in the context of hydrocarbons under Texas law?  The requirement is logical and uncomplicated: a plaintiff "establishes injury to correlative rights" *only if* he "demonstrates that reserves underlying his land are being drained, and that he does not have an opportunity to offset that drainage." *Texaco Prod. Inc. v. Fortson Oil Co.*798 S.W.2d 622, 624 (Tex. App—Austin, 1990, no writ).  If the rule applies, and if Plaintiff is to establish injury necessary to establish a taking under that rule (an actionable claim always requires an injury), it must show both that (1) drainage of Simsboro groundwater from beneath its land is happening, and (2) that Fazzino does not have an opportunity to offset it.  *Fazzino did not and cannot prove either element, and actually concedes that it is not happening.*

There is no evidence of *any* drainage as to the Fazzino tract. (Ex. C at 59:19–60:2) or as to any other landowner in the District (Ex. C at 77:10–13.)  There is no evidence of *any* reduction in the amount of Simsboro groundwater beneath the Fazzino tract (Ex. C at 38:8–12) or as to any other landowner in the District (Ex. C at 77:14–17, 42:20–43:8.) In fact, Plaintiff's expert concedes that—not just under Plaintiff's tract, but District-wide—"however many millions of gallons of Simsboro groundwater exists in a local area, that number of millions are going to remain functionally the same." (Ex. C at 43:4–8.) The Rules place only an annual cap on production, and permitted wells can keep

---

fair chance to recover the oil and gas in or under his land, or their equivalents in kind. It is evident that the word refers principally to drainage."); *De Bardeleben*, 305 S.W.2d at 143 (a valid contention of denial of a fair chance must allege "that a tract of land is being drained and the property being confiscated . . .")  The syllogism is simple: without drainage, there is no confiscation, and the "fair chance" doctrine never comes into play.

pumping the annually permitted amount indefinitely. (Ex. B at 38:18–25.) There is not even any evidence of any property, including the Fazzino property, actually suffering any decline in artesian head or pressure as a result of the rule amendments. (Ex. C at 37:23–38:7.) There thus certainly is not and cannot be any evidence of Fazzino suffering more than "ordinary drainage" as contemplated and allowed under *Day*. *Day*, 369 S.W.3d at 830.

No drainage or depletion of groundwater from beneath Plaintiff's land is actually happening. Plaintiff cannot establish the necessary first element of the requisite injury to state a *Marrs*-type claim. It also logically follows that if no groundwater is being drained, and the volume of groundwater beneath Plaintiff's land is the same today under the Amended Rules as it was under the prior Rules, then there is no confiscation or drainage that Plaintiff needs the opportunity to offset. Plaintiff's Complaint is an abstract hypothetical, and when pressed for actual facts that would make it actionable, Plaintiff has none to offer.

Court cases should be about actual injuries, not hypotheticals. The record makes it clear that Plaintiff has not suffered any actual injury. Plaintiff's takings claim therefore should be dismissed.

## CONCLUSION AND PRAYER

Defendant respectfully asks the Court to grant this Motion for Summary Judgment. Defendant further respectfully requests any and all other relief to which it may be entitled.

Respectfully submitted,

**LLOYD GOSSELINK**
  **ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By:    */s/ Jose E. de la Fuente*
        JOSE E. de la FUENTE
        State Bar No. 00793605
        jdelafuente@lglawfirm.com
        JAMES F. PARKER
        State Bar No. 24027591
        jparker@lglawfirm.com
        GABRIELLE C. SMITH
        State Bar No. 24093172
        gsmith@lglawfirm.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2026, I caused a true and correct copy of the foregoing to be transmitted by the Court's electronic filing system to the parties listed below:

Marvin W. Jones
marty.jones@sprouselaw.com
C. Brantley Jones
brantley.jones@sprouselaw.com
Sprouse Shrader Smith PLLC
701 S. Taylor, Suite 500
Amarillo, Texas 79105

Richard L. Coffman
rcoffman@coffmanlawfirm.com
The Coffman Law Firm
3355 West Alabama, Suite 240
Houston, Texas 77098

**ATTORNEYS FOR PLAINTIFF**

/s/ *Jose E. de la Fuente*
JOSE E. de la FUENTE