# EXHIBIT B

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
                            WACO DIVISION

FAZZINO INVESTMENTS, LP          )
for itself and all others        )
similarly situated,              )
                                 )
          Plaintiffs,            ) CIVIL ACTION NO.:
                                 )
VS.                              ) 6:25-cv-00001-ADA-DTG
                                 )
BRAZOS VALLEY GROUNDWATER         )
CONSERVATION DISTRICT,           )
                                 )
          Defendant.             )


          -----------------------------------
              ORAL AND VIDEOTAPED DEPOSITION OF
                   JOHN CHARLES FAZZINO II
   AS CORPORATE REPRESENTATIVE OF FAZZINO INVESTMENTS, LP
                      JANUARY 28, 2026
                         VOLUME 1
              ** REPORTED REMOTELY VIA ZOOM **

          -----------------------------------


     ORAL AND VIDEOTAPED DEPOSITION OF JOHN CHARLES
FAZZINO II, produced as a witness at the instance of the
DEFENDANT, and duly sworn, was taken in the above-styled
and numbered cause on January 28, 2026, from 8:59 a.m.
to 12:03 p.m., via Zoom before Rachel J. Payne, CSR in
and for the State of Texas, reported by machine
shorthand, at the Hotel Indigo, 211 Clay Avenue, Waco,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

                                              Page 1

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Mr. Richard L. Coffman

    THE COFFMAN LAW FIRM

    3355 West Alabama Street

    Suite 240

    Houston, Texas 77098

    713.528.6700

    rcoffman@coffmanlawfirm.com

    -- AND --

    Mr. Marvin W. Jones

    SPROUSE SHRADER SMITH PLLC

    701 South Taylor Street

    Suite 500

    Amarillo, Texas 79105

    marty.jones@sprouselaw.com

FOR THE DEFENDANT BRAZOS VALLEY GROUNDWATER CONSERVATION
DISTRICT:

    Mr. Jose E. de la Fuente

    LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.

    816 Congress Avenue

    Suite 1900

    Austin, Texas 78701

    512.322.5800

    jdelafuente@lglawfirm.com

ALSO PRESENT:

    MR. ALAN DAY - BRAZOS VALLEY REPRESENTATIVE

    MR. ROB CURNOCK - VIDEOGRAPHER

Page 2

dad.

Q. When was that formed, best you can remember?

A. '23, I believe.

Q. Okay. What -- generally speaking, what assets does it own?

A. The farm equipment -- some farm equipment, the crops.

Q. What kind of crops do y'all raise?

A. Cotton, corn, milo, soybeans.

Q. What do y'all raise on the Highway 6 tract?

A. That's -- it's in hay production.

Q. Okay. How long has it been in hay production?

A. Since -- since it was purchased.

Q. And so in -- and we spoke about it being transferred to the LP in '22. It was originally purchased by your father?

A. Right.

Q. When was that, do you recall?

A. I don't recall.

Q. Was it within your lifetime or --

A. Yeah.

Q. -- adult lifetime?

A. Vaguely, somewhere around '04 to '06.

Q. Okay. Early 2000s?

A. Yeah.

Page 13

Q.   What -- what interest and rights in the Highway 6 tract does JC&C Fazzino Farms have?

A.   None.

Q.   Does it have the right to farm that tract?

A.   They pro- -- I maintain it through the cattle operation, which is strict -- solely John Charles Fazzino II Farms.

Q.   Okay.

A.   Purs- -- land rent paid, I maintain fertilizer, take care of the bale- -- baling of hay.

Q.   All right.  So we're talking about a separate entity, John Charles Fazzino Cattle?

A.   Right.

Q.   Okay.  So we've got John Charles Fazzino Cattle, we've got JC&C Fazzino Farms, and we've got Fazzino Investments, LP, that are -- that are the players here?

A.   Right.

Q.   Okay.  And I guess what I'm trying to understand is, is -- does anyone pay Fazzino Investments, LP, you know, a hay lease, grazing lease, any payments like that, for the land?

A.   John Charles Fazzino II Farm pays land rent to the LP.

Q.   Okay.  And as a -- as a function of -- do you

Page 14

have a written lease?

A.   It's just a handwritten year-to-year deal.

Q.   Okay.  How much does John Charles Fazzino cattle pay to Fazzino Investments, LP, each year?

A.   I don't recall right now.  I deal with so many leases.  It's normally somewhere around 10- to $15 an acre.

Q.   And the -- as -- as part of the terms of that lease, you then have full access to and rights to grow the hay, cut the hay, sell the hay, et cetera?

A.   Right.

Q.   That's an all -- it's an all-in lease?

A.   Right.  We don't sell any hay, we just raise hay -- just raise hay and cut hay for myself.

Q.   Okay.  What is the typical hay yield on that property?

A.   Depends.  It's not -- it's not -- it's not irrigatable land, but it just depends on what -- the rainfall we get.  It -- we've done as much -- as little as two bales to the acre, we've done as much as five bales to the acre.

Q.   Okay.  So depending on the wet year -- how wet the year is --

A.   Right.

Q.   -- 2 to 5 bales per acre?

Page 15

Do you see that?

A. Yes.

Q. Okay. And I just want to -- want us to -- to be on the same page, when we're talking about property that -- in the complaint you allege groundwater rights were harmed, et cetera, we're only talking about that 69.41-acre Highway 6 tract?

A. Right.

Q. We're not talking about any other tract?

A. No.

Q. Okay. All right. I'm going to hand you what's been marked as Exhibit 5.

(Deposition Exhibit No. 5 marked.)

Q. (BY MR. DE LA FUENTE) Do you recognize Exhibit 5?

A. Yes.

Q. Okay. What is Exhibit 5?

A. Special warranty deed.

Q. All right. And what's the date on that deed?

A. September 16 of '21.

Q. Okay. And it reflects the grantor as being John Charles Fazzino and Mildred B. Fazzino?

A. Right.

Q. And those are your parents?

A. Yes.

Page 18

Q.   Okay.  And the grantee is the plaintiff here, Fazzino Investments?

A.   Yes.

Q.   Okay.  Now the date on this deed is September of '21, you had mentioned the land wasn't transferred until 2022?

A.   I was thinking it was done in January of '22, but this was done in the fall of '21.

Q.   Okay.  I just want to -- again, this is not a memory test, so --

A.   Right.

Q.   -- I just want us to be clear.

Does this refresh your recollection that this was the date that the deed was transferred?

A.   Yes.

Q.   Okay.  And I see that it lists a total of -- if you go through three pages -- ten tracts of land.

A.   Right.

Q.   And I see Tract 5 being 69.41 acres.

A.   Right.

Q.   And that is the tract we're talking about here?

A.   Yeah, that is the tract we're talking about.

Q.   Okay.  And we are not talking about any of the other ten tracts?

A.   No.

Page 19

Q.   Okay.  Did Fazzino Investments, LP, pay anything to John Charles Fazzino and Mildred B. Fazzino for any of this land?

A.   No.

Q.   It was a gift transfer?

A.   Yes.

Q.   Okay.  Do you recall what -- or do you have any knowledge of what the original purchasers, John Charles Fazzino and Mildred B. Fazzino, paid for the land in the early 2000s?

A.   Offhand, I don't.

Q.   Sorry about that.  Thank you.  I was hoping the ice storm would take care of my cedar fever, but alas, it did not.

But this deed does reflect the current ownership and status of the Highway 6 tract?

A.   Yes.

Q.   Okay.  I'm going to hand you what is being marked as Exhibit 6.

(Deposition Exhibit No. 6 marked.)

THE REPORTER:  Sorry.

Q.   (BY MR. DE LA FUENTE)  And I'll represent to you this is a map pulled off the Robertson County CAD site.

A.   Right.

Page 20

Q.   Okay.   And he provided to you this map indicating on this 69.41-acre tract that a well producing up to 585 acre-feet of Simsboro water could be put in there?

A.   I think those are the correct numbers.

Q.   Okay.   And in this conversation, you indicated to Mr. Day that you were considering developing the property for residential purposes, didn't you?

A.   In the future.

Q.   Okay.   And we can see in more detail that property to the southwest, that adjacent property, developed for residential purposes, right?

A.   Yes.

Q.   In that conversation, you discussed possibly either having a well in place that could sell water or -- or granting the rights to such a well to the local water utility Wellborn SUD.   Do you recall that?

A.   Yes.

Q.   Tell -- tell us what you were -- what you were talking about there.

A.   There's several ways to approach what we were talking about.

Q.   Okay.

A.   If we subdivide it, drill a well, let the rural water system produce the well, supply water to

Page 24

subdivision, any excess water could possibly be used for whatever they need to use it for.  There's other subdivisions going in in the area, more water is needing to be produced within rural water systems and within the cities.

Q.  So this was one possibly for -- for local use, in other words, a well that would be used by the -- by the residential lots on the property and any excess would go into the Wellborn system to serve other customers in the area?

A.  Correct.

Q.  So local rural customers?

A.  Yes.

Q.  Okay.  Did you ever have any conversation with Wellborn about that?

A.  No.

Q.  You talked about maybe developing this property for residential purposes in the future.  What -- what additional planning and work have you done?  And I'm --

A.  We have- --

Q.  -- have you sketched outlines, anything like that?

A.  We haven't done anything like that because we're still waiting on TxDOT to figure out where they're going to put the new highways.  Until that's -- until

Page 25

that's actually formatted, we don't -- if it's going to come right through the property, you don't know how to subdivide anything.

Q.  What highway may be coming through the property?

A.  I don't know the actual number, it stops at Rogers right now.

Q.  And where would it go?

A.  It -- well, it's -- from there, it's supposed to come through Milam County back around into Robertson County, tie into Highway 6, and it's supposed to tie into, what is that, 249 south -- on the south side of Navasota.  There's several -- there's several highway projects that are going on in the next 20 years.

Q.  Has TxDOT provided any potential route maps that show highway going through there?

A.  They've had meetings, they've provided potential route maps, but nothing set in stone yet.

Q.  Are there route maps that do go through this property?

A.  Not at this time that I know of.

Q.  Okay.

A.  Everything right now is still to the north of us.

Q.  How close would the nearest route map put a

Page 26

highway to this property?

A.   Probably a mile to two miles.

Q.   To the north?

A.   Yes.

Q.   And that would intersect Highway 6?

A.   Yes.

Q.   So that would provide additional highway -- or additional highway access to the area around this property?

A.   Right.

Q.   And at that point with that additional access, would it be more attractive to develop this property for residential purposes?

A.   Yes.

Q.   But you don't know if that's going to happen yet?

A.   No.

Q.   Has TxDOT given any idea of when they will settle on a route?

A.   I haven't heard any definite.

Q.   Have you heard any general?

A.   Trying to find -- within the next ten years.

Q.   Have you undertaken any efforts to value the property that was subdivided?

A.   No.

Page 27

those lots?

A. No idea.

Q. Is that -- is that a lot owned by your father individually or by LP?

A. LP.

Q. When did LP acquire that or is that one --

A. That -- that's one of the tracts in the --

Q. The warranty deed?

A. Yes.

Q. I'm looking back at Exhibit 5, do you know which tract that would be? And I'll see, might it be Tract 6?

A. I think it's Tract 6.

Q. Okay. Did you -- in considering the possible residential use of the Highway 6 tract, have you even just, you know, heard word of mouth, anything for how much residential tracts near it might go for?

A. Not on this particular place, but we -- I've been -- I've been pricing small acreage, residential-type stuff to be developed for my son.

Q. How much are you finding small residential tracts are going for in the area?

A. Everything we've been looking at has been anywhere from 2 to -- 2 to 10 acres, and they're -- that's running anywhere around from 10,000 an acre up to

Page 29

18- to 20,000 an acre.

Q. So ballparking 10- to 20,000 an acre for -- for a residential site in this area?

A. Right.

Q. Okay. Did you ever do any, you know, back-of-the-envelope math of how many lots you could divide this into?

A. I just -- I was just figuring one-acre tracts. 69.4 acres, that would put you at 69 to 70 tracts.

Q. Depending on how much land you used for roads and infrastructure?

A. Right.

Q. Would -- was your anticipation that these tracts would be sold or leased?

A. Sold.

Q. Now I'm also going to ask you some questions today that I know in discovery Fazzino Investments, LP, has provided some answers at times saying that the full testimony will be given by an expert.

But I need to ask you about Fazzino Investments, LP, knowledge to the best you know, and so I'm going to ask you one of those questions now.

And that is, do you have any knowledge or opinion what the value of the Highway 6 tract is, what the market value of the Highway 6 tract is today?

Page 30

Q.   That's very clever.  I had a client do that a couple years ago.

So there are a lot of variables that can go into the property value in this area?

A.   Yes.

Q.   In looking at those 200-acre tracts, do those include the underlying groundwater?

A.   Yes.

Q.   And the underlying -- with underlying groundwater, you found the value being anywhere from -- well, you said 200 acres at 6 -- $6,000?

A.   Right.

Q.   Do you know what the value -- do you have any idea of the value of the tract, of the Highway 6 tract, before the district amended its rules back in, say, summer of '23?

A.   Not on monetary basis.

Q.   Okay.  On what basis?

A.   With 60 to 75 percent more water availability, your value is obviously going to go up.

Q.   You have never -- have you quantified that value?

A.   I have -- I'd have to rely on experts on that. I haven't got into the formulas.  All I know is we've been cut 25 percent.

Page 32

Q.   Okay.  And I am asking about the value of the tract as a whole.  This tract includes surface rights and groundwater rights together, right?

A.   Right.

Q.   There's nothing that's been carved out?

A.   No.

Q.   Okay.  So it's all in?

A.   Yes.

Q.   And I'm asking about the all-in value.  Do you have any information about what the all-in value was before the rule change versus after the rule change?

A.   No.

Q.   Okay.  I'm going to hand you what's being marked as Exhibit 8.

(Deposition Exhibit No. 8 marked.)

Q.   (BY MR. DE LA FUENTE)  I'm going to give you a few minutes to look through Exhibit 8.

Do you recognize the documents in Exhibit 8?

A.   I hadn't -- hadn't really seen them, but looks like it's the --

Q.   Sorry.  It looks like what?

A.   It looks like it's the appraisal information from the county.

Q.   And the Highway 6 tract is located in Robertson

Page 33

County, right?

A. Yes.

Q. And property taxes are paid to Robertson County?

A. Yes.

Q. Okay. And Fazzino -- as of '21, when the land was transferred, Fazzino Investments, LP, is the entity that pays those taxes?

A. Since '21.

Q. Okay. All right. On these documents, you can look at the middle bottom, there's a grand summary of the value. Do you see that?

A. Yes.

Q. Now, that's not the assessed value over on the right, the assessed value is a much lower number. Do you see that?

A. Yes.

Q. And that's -- this land is in ag production, so ag exemption, right?

A. Right.

Q. Okay. But under the grand summary, you see that in 2020, the assessed value of the property as a whole was 407,000 and change?

A. Yes.

Q. All right. And then we turn to the next page.

Page 34

In '21, at the time of -- of the year of the transfer to Fazzino Investments, LP, it was 405,000 and change?

A.  Yes.

Q.  All right.  And then we roll to the next page, in '22, it was 409,000 and change?

A.  Yes.

Q.  And then we roll to '23, and it's 513,000 and change?

A.  Yes.

Q.  So it went up over $100,000 in that year?

A.  Yes.

Q.  Did Fazzino Investments, LP, protest tax assessment?

A.  We've never done a formal protest.

Q.  Did you do an informal protest on -- on this tract?

A.  Not on this tract.

Q.  Okay.  And then we go to -- to '24, and it was assessed at 515,000 and change?

A.  Yes.

Q.  And this last year, '25, also assessed at $515,000 and change?

A.  Yes.

Q.  And Fazzino Investments, LP, did not contest the value assessed after 2023, did it?

Page 35

A.   No.

Q.   Okay.  Paid the taxes, levied as stated?

A.   Yes.

Q.   The Highway 6 tract, at the time of the transfer to Fazzino Investments, LP, in '21, was it owned free and clear or -- or was it subject to a mortgage being paid on by your father and mother?

A.   Free and clear.

Q.   Did they buy it free and clear or did they finance it?

A.   I don't know about that.

Q.   You just know that by '21, they owned it free and clear?

A.   Yes.

Q.   Has Fazzino Investments, LP, or -- or anyone, the trust, anyone, considered using or tried to use this tract -- Highway 6 tract as collateral for -- for any loan or potential loan since '21?

A.   To my knowledge, no.

Q.   From 2020 to now -- and, well, from 2020 to present, have you -- has Fazzino Investments, LP, or anyone working on behalf of Fazzino Investments, LP, obtained any formal appraisal or valuation of the Highway 6 tract?

A.   Not that I'm aware of.

Page 36

Q.   Had -- for that same period of time, has anyone that you know of obtained an informal appraisal or valuation of the tract?

A.   Not that I'm aware of.

Q.   Okay.  Has anyone obtained a formal or informal appraisal or valuation of the value of any separate portion of the tract, like just the surface rights or just the groundwater rights?

A.   Not that I'm aware of.

Q.   And we just looked at Exhibit 8, the tax appraisals, are you -- are you aware of any other appraisals like that?

A.   No.

Q.   Anything that would show us what the value of the property was?

A.   No.

Q.   Have you had to provide any valuation of it to anyone to do an accounting of the assets of the trust or Fazzino Investments, LP?

A.   Not that I'm aware of.

Q.   And so this is just me -- you understand I need to know what you know and what you don't know.

Other than the tax records we looked at, you don't have any evidence at present of the fair market value of the Highway 6 tract as a whole?

Page 37

A.   No, I don't.

Q.   And -- and I'm asking you as a representative of Fazzino Investments, LP.  Are you aware of any evidence Fazzino Investments, LP, would have?

A.   No.

Q.   We just mentioned a -- a loss of 75 percent of groundwater.  Do you -- do you have or know of any appraisals showing the value of that alleged loss?

A.   No.

Q.   All right.  Let's -- I want to talk a little bit about the amended rules and the effect of those rules.

Is it your understanding that the rules for this Highway 6 tract, at least, changed the volume of groundwater and the rate of pumping that the owner can extract per year?

A.   Yes.

Q.   Okay.  Now it's not your understanding that it's a total cap on the volume of groundwater that can be extracted forever and ever on the property, right?  In other words, it doesn't say you can pump 50,000 gallons of -- 50,000 acre-feet of water from this property over the life of this property but that's it?  It's an annual cap, right?

A.   Right.

Veritext Legal Solutions
800-336-4000

with you either because you're obviously not reading the right complaint.

Q. (BY MR. DE LA FUENTE) Okay. What royalty, interest or other payment will -- will Fazzino Investments, LP, get pursuant to this lease?

MR. COFFMAN: He's not going to answer that question.

A. The instruction of my lawyer is I'm not going to answer the question.

MR. COFFMAN: He's not going to answer the question. I've given you a lot of latitude on land that's not even a part of this case.

Q. (BY MR. DE LA FUENTE) So you're going to follow your lawyer's instruction and not answer the question as to the value that Fazzino Investments, LP, will receive for the sale of groundwater within the district?

MR. COFFMAN: Pertaining to tracts of land that are not part of this lawsuit, correct.

THE WITNESS: Correct.

MR. COFFMAN: Just because you can ask the question doesn't mean you should, and he's not going to disclose this confidential information that has nothing to do with this case.

Q. (BY MR. DE LA FUENTE) Has Fazzino Investments,

Page 55

LP, obtained any information about the value of its groundwater on any of its property?

A.   No.

Q.   So it doesn't have any information about the value pursuant to the terms of the very lease we're talking about?

A.   There's no terms yet because there's no -- the -- no production, no deal's been made to put the values on.

Q.   I'm not asking if -- if money has been paid, I'm asking if terms are set.  Is there a formula in this lease for when production happens, how much Fazzino Investments will be paid?

A.   I believe there is a formula.

Q.   Okay.  And this lease and the option has indeed been executed, correct?

A.   The option has been executed.

Q.   Did Fazzino Investments approach Upwell or did Upwell approach Fazzino about this transaction?

A.   I approach -- Fazzino Investments approached Upwell.

Q.   Okay.  When?

A.   Fall of 2013 or spring of 2014.

Q.   Ten years before the rule change?

A.   Just a minute.  That -- 14th was the date.

Page 56

A.   Okay.

Q.   What is the smallest acreage?

A.   195.

Q.   195.

And was it your understanding that prior to the rule change, the 6900 -- the 69-acre Highway 6 tract would have been able to obtain a permit for an 1100 GPM well or better?

A.   Ask that again.

Q.   Sure.  Is it your understanding prior to the rule change, that the Highway 6 69-acre tract would have been eligible for a Simsboro permit of a well at 1100 GPM or better rate?

A.   Prior to the rule change?

Q.   Yes.

A.   I never did any investigation on how much water we could develop off of that 69 acres.

Q.   You never did any investigation how much water you could produce off of that before the rule change?

A.   No, because it wasn't irr- -- it wasn't an irrigated piece of property.

Q.   Did you ever make any effort to market or sell the groundwater from underneath the Highway 6 tract at any time?

A.   Other than when I visited with Mr. Day about

Page 62

what could be produced after the rule changes.

Q.  So you made no effort to market any groundwater underneath the Highway 6 tract before the rule change?

A.  Not actually market water, no.

Q.  Well, anything to -- to possibly market or sell or lease the -- the rights to the groundwater, to any way generate revenue from Simsboro groundwater underneath this, did you pursue any efforts?

MR. COFFMAN:  Prior to the rule change?

MR. DE LA FUENTE:  Yes.

A.  Prior to the rule change, no.

Q.  (BY MR. DE LA FUENTE)  Okay.  And after the rule change, you referenced conversation you had with Mr. Day about the residential development and maximum well size?

A.  Yes.

Q.  Any other efforts to generate any revenue from the groundwater -- Simsboro groundwater underneath the Highway 6 tract since the rule change?

A.  I can't recall anything.

Q.  When did you talk with College Station about possibly obtaining groundwater, groundwater rights from you -- from -- from Fazzino Investments?

A.  I never talked to College Station.

Q.  Never?

Page 63

A.   No.

Q.   Do you -- have you ever discussed with any of the neighboring landowners combining acreage under single control, so a larger footprint could obtain a larger well?

A.   No.

Q.   Have you ever done any analysis of possible footprints including surrounding acreage to -- to inform you as to people you might want to approach to combine acreage?

A.   No.

Q.   So before the rule change, you didn't explore a permit and were not marketing the Highway 6 tract because it had no irrigation purpose, you told us that earlier, right?

A.   Right.

Q.   Okay.  And afterwards, you haven't explored or tried to market the groundwater as well, right?

A.   No.

Q.   Okay.  Either as just the 16 -- the 69.41-acre tract or in combination with other tracts, you haven't -- you haven't looked into that either?

A.   No.

Q.   But you do know under the rules, larger combined acreage under -- under one control for one

Page 71

conclusion?

MR. DE LA FUENTE:  I'm asking for facts.

Q.  (BY MR. DE LA FUENTE)  Have they physically invaded your property, as you understand what a physical invasion would be?

And I'll give you -- I'll give you a nice example.  I mean, if I -- if I cut through your gate and walk onto your land, I physically invaded your property. I'm a trespasser on the surface.  I imagine you wouldn't take too kindly of that either.

MR. COFFMAN:  Well, but that's not the only way you can have --

A.  That's not the only --

MR. DE LA FUENTE:  Hold on.

A.  -- invasion that -- that can be -- that can happen.

Q.  (BY MR. DE LA FUENTE)  I understand.  That's why I gave you an example as to one type of physical invasion.

I'm asking you if the district -- if the district itself has committed -- if it has physically invaded the Highway 6 tract in any way?

A.  To the aspect of taking something where we're not treated equally, any other area with the rule changes, yes, we've been invaded.

Page 84

Q.   Okay.   I understand you believe the rule change invades your right.   I'm asking about a physical invasion, not --

A.   Not a physical invasion, no.

Q.   Okay.   Has anyone else -- are you aware of anyone else physically invading the Highway 6 property?

A.   Yes, I am.

Q.   Who?

A.   I've caught people going through us to steal stuff from the junkyard.

Q.   There you go.

Okay.   Are you aware of anyone else physically invading the groundwater beneath the Highway 6 property?

A.   No.

Q.   Okay.   Just want to get this in there, although I'm going to ask you about that.   I'm going to hand you what's been marked as Exhibit 13.

(Deposition Exhibit No. 13 marked.)

Q.   (BY MR. DE LA FUENTE)   Can you tell us what Exhibit 13 is?

A.   Rules of Brazos Valley Groundwater Conservation District.

Q.   These are -- are you aware these are the current operative rules?

Page 85

MR. COFFMAN:  Without looking at them?

MR. DE LA FUENTE:  That's what I'm asking.

A.  That's what it says, "last amended."

Q.  (BY MR. DE LA FUENTE)  All right.  And your allegations are that the Highway 6 property was harmed by the amendment of Rule 6.1 and 7.1, right?

A.  Yes.

Q.  Okay.  There was no -- but there was no contract in place to sell water -- groundwater or any interest in groundwater under the Highway 6 tract before the rules changed, right?

A.  No.

Q.  There was no other commitment or option to -- to acquire, lease, use any such groundwater under the Highway 6 tract before the rules changed?

A.  No.

Q.  And Fazzino Investments, LP, had the right to obtain a permit for a larger volume well on the Highway 6 tract before the rules changed, right?

A.  Yes.

Q.  All right.  I do want to take you back to Exhibit 4, and I'll give you this predicate and your lawyer as well.  I'm not -- I'm not -- I'm not trying to be tricky here.  I need to know what you -- what Fazzino Investments knows versus what it's going to depend on an

Page 86

of vol- -- the amount of water that could be produced on an annual basis, right?

A.    Right.

Q.    But that's not the amount of wat- -- that's not the volume of water total that's underneath the land?

A.    Right.

Q.    Okay.  And as to the amount of water that's underneath the land or -- or that has been drained by anyone underneath the land, do you have any knowledge other than what your expert will say?

A.    No.

Q.    Okay.  I have the same question about Interrogatory Number 7, "If -- if you contend that someone has drained or confiscated groundwater, we ask for the identity of who that is."

And your answer, again, says "any information will be the result of expert analysis and provided in the expert report."

Do you see that?

A.    Right.

Q.    Okay.  And my question to you is:  Do you have any information or knowledge about anyone who has drained or confiscated Simsboro groundwater underneath the land -- underneath the tract, Highway 6 tract, other than what your expert is going to say?

Page 88

A.   No.

Q.   Drilling a -- a well and doing the engineering for and drilling a well costs money, right?

A.   Yes.

Q.   Okay.  If you were to have done -- well, you've done the engineering on some, say, you know, 1,290-acre-foot wells, for example, in the permits in Exhibit 9, I believe, how much was the engineering cost for each of those wells?

A.   I don't recall right offhand.

Q.   Do you have a ballpark?

A.   I'm thinking it was, like, $1,500 a permit.

Q.   Okay.  And if you were to drill your own high-volume well, that would cost a significant sum of money, wouldn't it?

A.   Yes.

Q.   Have any idea how much that would be?

A.   I've been told up to a million dollars, maybe more.

Q.   Okay.  And then operating it annually and maintaining it, that costs more money, right?

A.   Yes.

Q.   Any idea how much a -- you know, again, a --

A.   No, I don't have any idea what size pumps, what size motors.  There's no way to know that until you get

Page 89

a well in production.

Q.   And I'm asking for -- for maybe one of the -- one of the permitted wells you've got on some of the other property, like the 1290-acre-feet wells at 1,000 GPM.

A.   I've never checked into the maintenance costs or operation costs because at 1200 -- what was the number you had?

Q.   Okay.  So let's see.  I used the -- I used one of the smaller wells in these permits, so it's 1,000 GPM, 1290 acre-feet.

A.   1,000-gallon-a-minute well, but you can only produce how many acre-feet off of that well?

Q.   1290.

A.   1290.  Is that 1290 acre-feet going to be produced in 14 days, 30 days, 6 months, 12 months? That -- you've got to know what size pumps you're going to do and how quick you're going to pump the volume of water before you can get into maintenance and operation costs.

Q.   Okay.  So you can have a range, right?

A.   Yeah, you can have a range.

Q.   For a well that's authorized for 2,100 GPM and 2710 acre-feet is probably going to be bigger, right?

A.   Possibly.

Page 90

Q. Okay. There is a range of costs involved there, it's not immaterial. It's -- it's actual money, right?

A. Yeah.

Q. Okay. Have you done any analysis of what those -- any of those costs would have been for the Highway 6 tract before September 14, 2023?

A. No.

Q. Have you gathered any information or done work to determine the costs for the 584-acre-foot well that could be allowed on the property after September 14, 2023?

A. No.

Q. The question is going to seem obvious, but I need to -- I need to ask it.

You indicated you haven't undertaken any actual efforts to market or sell any interest in the groundwater underlying the Highway 6 tract, right?

A. No.

Q. So you haven't spent any money in doing so?

A. No.

Q. Okay. In fact, all in on possibly developing the groundwater on this tract other than this litigation, you haven't spent anything in furtherance of that?

Page 91

A.   No.

Q.   And have you spent any money on this litigation?

A.   No.

Q.   In looking at -- you looked at Exhibit 7, the -- the drawing you asked Mr. Day to do of the well footprint and permissible amount under the rules, that is a well that could be drilled and produced under the current rules, right?

A.   Yes.

Q.   Okay.  And, well, you were discussing it in the context of possible residential use or connection with Wellborn SUD, right?

A.   Yes.

Q.   Okay.  So -- so that well could have -- you could have a Simsboro well on this property that would have some purpose and use, right?

A.   Yes.

Q.   Okay.  And, of course, the surface estate has purpose and use, right?

A.   Yes.

Q.   It has agricultural use today?

A.   Yes.

Q.   And it, as you've explored it, could have additional use or value if it was developed for

Page 92

residential purposes?

A. Right.

Q. And who knows, depending on what happens with the road, it could have some other use?

A. Right.

Q. It has highway frontage, right?

A. Yes.

Q. I asked you about whether you'd done anything with any of the landowners near the Highway 6 tract about, you know, grouping together the property for -- for possibly marketing groundwater and you indicated you haven't had those conversations?

A. No.

Q. Okay. When the rules were maybe heading for amendment, did you talk with any of those landowners about -- about the pending rule change and what it might mean?

A. No.

Q. Did you talk to any of them about whether the rule change was -- was unlawful or would be a taking of your property?

A. No.

Q. Did you talk to any other landowners within the district about whether the rule change was going to be harmful, unlawful or be a taking to your property?

Page 93

from obtaining necessary groundwater production permits
from defendant."  Right?

A.  Right.

Q.  That's your answer.

We've already discussed the fact that you
didn't make any efforts to develop, sell or market the
groundwater for the Highway 6 tract before the rule
change, right?

A.  Right.

Q.  You didn't make any effort afterwards, right?

A.  Right.

Q.  And there is a -- a possible use of that
groundwater such as a Wellborn SUD or the residential
development, right?

A.  Right.

Q.  Okay.  I do want to take us back to Exhibit 4
and your supplemental responses.  And on Page 3 of that
Interrogatory Number 2.  This Interrogatory Number 2
asks for each tract of land identified in your response
above, state the value of each such tract and the use of
which it's currently put, agricultural, industrial,
residential, et cetera.  Do you see that?

A.  Yes.

Q.  Okay.  And your response was that plaintiff
currently uses the 69.41-acre tract for agricultural

Page 96

purposes and then plaintiff does not have sufficient knowledge or expertise to place a value on the groundwater under the property.

And I want to put a finer point to that. At present, you don't have any knowledge of the value of the property as a whole other than the tax appraisal records we've seen or any separate estate of the property, the surface or the groundwater, on their own, right?

A.   Right.

Q.   Okay.  Okay.  I do want to ask regarding the supplemental responses, Number 4, Exhibit 4, the Interrogatory Number 8.  Still on Page 7 of Exhibit 4, the very bottom.

"Identify any investment or expenditure of funds by both the nature and character of the expenditure and the amount spent made by Fazzino in selling, marketing, developing or producing groundwater or attempting to do so including groundwater in place associated with the real property, which is the Highway 6 tract."

Do you see that?

A.   Yeah.

Q.   Now you refer back to response to Interrogatory Number 4, which references the conversation with David

Page 97

Lynch of Upwell regarding the prospects of including the 69.41-acre tract.  We talked earlier you mentioned that the 69.41-acre tract had not been included in the conversation with Mr. Lynch at all?

A.  I've never spoke with David Lynch about including 69.4.

Q.  Okay.  And as we've already discussed, you don't have any specific or particular investments or expenditure of funds trying to market the groundwater under 6 -- under that --

A.  No.

Q.  -- Highway 6 tract?

A.  No.

Q.  Okay.  Here's what's being marked as Exhibit 15.

(Deposition Exhibit No. 15 marked.)

Q.  (BY MR. DE LA FUENTE)  Do you recognize Exhibit 15 as Responses to Defendant's Second Interrogatories?

A.  Yes.

Q.  Okay.  I'm going to ask you about Interrogatory Number 10, which is on Page 5.  And -- and I asked you the question about the subject matter before, but I just need to ask it in the context of this particular interrogatory about who is -- if there's anyone draining

Page 98

or confiscating the groundwater underneath the Highway 6 tract, who is it.

And the answer here is, you did -- you denied the -- the request for admission because you're not a hydrogeologist and you don't have the knowledge or expertise to admit or deny any request of who -- identifying who that person is.

Do you understand that?

A.   Yes.

Q.   And you are depending on that expert to identify anyone who would have drained or confiscated water?

A.   Yes.

Q.   Okay.  All right.  Interrogatory Number 11. Interrogatory Number 11 asks you to "Identify any contracts or agreements in place executed before or after September 14, 2023, with any party for the sale by you of Simsboro aquifer groundwater underlying any real property identified -- and it's the deed -- or referenced in your complaint and identify which contracts or agreements correspond to which."

I just want to ask, we've looked at the -- the option agreement and the lease regarding certain tracts, there's no other contract for any other Simsboro groundwater owned by Fazzino Investments, LP, correct?

Page 99

Veritext Legal Solutions
800-336-4000

Q.   Okay.  And that is indeed the only tract you're referencing in Paragraph 6 of your complaint, right?

A.   Right.

Q.   Okay.  Okay.  Request for Admission Number 7 at the bottom of that page, "Admit that you did not have any contract in place with any party for the sale by you of Simsboro groundwater -- aquifer groundwater underlying any real property referenced in Paragraph 6 of Plaintiff's Original Class Action Complaint before September 14, 2023."

Do you see that?

A.   Yes.

Q.   So, again, we're just talking about the Highway 6 tract --

MR. COFFMAN:  Okay.

Q.   (BY MR. DE LA FUENTE)  -- right?

A.   Right.

Q.   That's the only one iden- -- referenced in Paragraph 6, right?

A.   Right.

Q.   Okay.  And isn't it true you did not have any contract in place with anyone for the sale by any -- the sale of any of that groundwater before that day?

A.   I did not have any con- -- any contract.

Q.   Okay.  So this should be admitted instead of

Page 103

denied, right?

A.   Yes.

Q.   Okay.  All right.  And then I think -- I'm going to ask about the next -- Request for Admission Number 8.  Also -- these are all asking to admit that you didn't have a contract in place for groundwater -- Simsboro groundwater, and it's asking for underlying any of the real property referenced in Paragraph 6, which, again, as you've told us is just Highway 6 tract, right?

A.   Go ahead.

Q.   Sure.  The property referenced in Paragraph 6 of your class action complaint is just the Highway 6 tract, right?

A.   Right.

Q.   Okay.  And you didn't have -- this says "Admit that you did not have any contract in place with any party for the sale of ground -- Simsboro groundwater from September 14th to present for that tract," right?

A.   Correct.

Q.   And you do not have any such contract?

A.   I do not.

Q.   Okay.  So this should also be admitted?

A.   Yes.

Q.   Okay.  And Number 9 is just broadly "Admit that you don't have any contract in place with any party for

Page 104

the sale of that groundwater underlying any of the real property in Paragraph 6, which is the Highway 6 tract."

You don't have any such contract, do you?

A. No.

Q. Okay. So this should also be admitted?

A. Yes.

Q. Okay. And Number 10, asks the pre-September 14, 2023, question a little differently, "Admit that you didn't have any contract in place with any party for the right of that party -- that party to lease, own or develop Simsboro groundwater underneath the Highway 6 tract before September 14th."

And you've told us you did not have any such contract?

A. Right. Yeah.

Q. So this should also be admitted?

A. Yes.

Q. Okay. And you have not applied for any permit for a Simsboro well on the Highway 6 tract since September 14, 2023, that the district has denied or declared administratively incomplete or anything like that?

A. I have not applied for a permit on that particular tract in any form or fashion before or after rule changes.

Page 105

Mr. Richard L. Coffman..... 00:00:00

Mr. Jose E. de la Fuente..... 02:29:47

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Richard L. Coffman, Attorney for Plaintiff FAZZINO INVESTMENTS, LP for itself and all others similarly situated

Mr. Jose E. de la Fuente, Attorney for Defendant BRAZOS VALLEY GROUNDWATER CONSERVATION DISTRICT

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me

Rachel J. Payne  Texas CSR 8399

Expiration Date: 09/30/2026

VERITEXT LEGAL SOLUTIONS

Firm Registration No. 571

300 Throckmorton Street

Suite 1600

Fort Worth, Texas 76102

817.336.3042

Page 114

I, JOHN CHARLES FAZZINO II, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_John Charles Fazz II_
JOHN CHARLES FAZZINO II

THE STATE OF Texas )
COUNTY OF Robertson )

Before me, __Tyler Narro__, on this day personally appeared JOHN CHARLES FAZZINO II, known to me (or proved to me under oath or through __TXDI:12333031__) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __3rd__ day of __March__, __2026__.

_Narro_
_____
NOTARY PUBLIC IN AND FOR
THE STATE OF __Texas__
COMMISSION EXPIRES: __12.23.29__

TYLER NARRO
Notary ID #133502896
My Commission Expires
December 23, 2029

Page 112